E-FILED
Wednesday, 20 May, 2026  01:56:26 PM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 25-cr-20008 |
| | ) | |
| | ) | |
| LISA SANGSTER, et al., | ) | |
| Defendant. | ) | |

**OPINION**

**COLLEEN R. LAWLESS, United States District Judge:**

Before the Court are Defendants' Motions for Discovery Related to Selective Enforcement Based on Race. (Docs. 133, 161, 164).[1] For the reasons below, Defendants' motions are denied in part and granted in part.

I.     BACKGROUND

Defendants have adopted in full a motion filed by defendant Ambrosia Renicks (the "*Renicks* Motion"). (Doc. 14 in Case No. 24-cr-30041).[2] Defendants argue the overwhelming majority of individuals charged in the Central District of Illinois ("Central District") with wire fraud stemming from applications for loans through the Paycheck Protection Program ("PPP") are black. Since 2022, 98.8% of PPP cases in the Central District have been against black Defendants. (Doc. 162; Doc. 251). Defendants made

---

[1] Defendants Emory Sangster, Jan Marie Sangster, Lisa Sangster, Kayla Williamson filed Docket Entry 133, Defendant Corey Ames filed Docket Entry 161, and Nicholas Nickerson and Jade Spaulding filed Docket Entry 164. The Court previously granted Defendants Gabriel King and Ivetta Sangster's request to join Docket Entry 133. (Docs. 136, 158).

[2] Defendant Corey Ames' motion is nearly identical to the *Renicks* Motion but he does not expressly adopt hers as his own. (Doc. 161).

several initial discovery requests, including a request that the Government provide a factual basis for the investigating agency's decision to pursue or initiate an investigation against each of the individuals named in Exhibit A of the *Renicks* Motion. (Doc. 133 at 2).

The Government contends Defendants in this case were charged after Amtrak's Office of Inspector General ("Amtrak's OIG") independently conducted a race-neutral investigation into whether Amtrak employees were fraudulently taking advantage of COVID-era relief programs. As part of this investigation, Special Agent Daniel Bergan searched the publicly available Small Business Administration ("SBA") database to determine if any Amtrak employees had obtained Economic Injury Disaster Loans ("EIDL") advances or PPP loans. Bergan identified three Amtrak employees in the Central District who appeared to have fraudulently obtained loans: Defendants Evan Sangster, Lisa Sangster, and Nicholas Nickerson. After review of the SBA database revealed Defendant Octavia Murphy obtained a suspicious loan using Evan Sangster's address, further investigation of bank records revealed Defendants Emory Sangster, Ivetta Sangster, Jan Sangster, and Kayla Williamson paid kickbacks to Octavia Murphy and Evan Sangster after receiving fraudulent EIDL advances and/or PPP loans. The Government states no other PPP Defendants were referred for prosecution in the Central District by Amtrak's OIG besides those charged in this case. Notably, unlike in *Renicks*, the Government's response was not supported by an affidavit.

Defendants' current discovery requests are as follows: (1) a full list of every PPP case in the Central District and the race of the defendants in those cases; (2) a list of the agencies referring these PPP cases to the U.S. Attorney's Office in the Central District; (3)

the factual basis for the investigating federal agency's decision to pursue or initiate an investigation against each of the individuals listed in Exhibit A of the *Renicks* motion or alternatively, the factual basis for Amtrack's OIG's decision to pursue or initiate an investigation against the various Defendants it investigated listed as Defendants in Exhibit A; (4) all documentation from the agencies produced pursuant to Request 2 that contains information on how the agency's agents, investigators, and supervisors ensured or checked that they did not screen PPP loan recipients on the basis of their race, color, ancestry, or national origin; and (5) all documentation from the agencies produced pursuant to Request 2 regarding the criteria those agencies use to determine when to send PPP investigations to the U.S. Attorney's Office in the Central District. Defendants also request information on whether Amtrak's OIG identified any other individuals they suspected were fraudulently taking advantage of COVID-era relief programs and if so, why they were not referred for prosecution. (March 11, 2026 Status Hearing).

## II.    DISCUSSION

"The Constitution prohibits selective enforcement of the law based on considerations such as race. . . . The constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause." *Chavez v. Illinois State Police*, 251 F.3d 612, 635 (7th Cir. 2001) (quoting *Whren v. United States*, 517 U.S. 806, 813 (1996)).

Defendants do not allege selective prosecution, which "occurs when, from among the pool of people referred by police, a prosecutor pursues similar cases differently based on race." *Conley v. United States*, 5 F.4th 781, 789 (7th Cir. 2021). Rather, Defendants seek

discovery based on selective enforcement, which occurs when law enforcement "investigate people of one race but not similarly-situated people of a different race." *Id.* Thus, the alleged constitutional violation precedes the prosecutor's involvement and "[i]t does not matter if prosecutors then pursue each case equally because the pool of defendants itself was racially selected." *Id.*

A selective enforcement claim contains two elements. The defendant must show that law enforcement's actions (1) "had a discriminatory effect" and (2) "were motivated by a discriminatory purpose." *Chavez*, 251 F.3d at 635–36; *see also Conley*, 5 F.4th at 789. The standard of proof for a selective enforcement claim is preponderance of the evidence. *Conley*, 5 F.4th at 795–96. While discriminatory effect can be shown by statistical evidence, *see Chavez*, 251 F.3d at 637–38, discriminatory purpose is more fluid and "demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available," *Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977). "A plaintiff must show discriminatory purpose 'in *his* case.'" *Conley*, 5 F.4th at 789 (quoting *McCleskey v. Kemp*, 481 U.S. 279, 292 (1987) (emphasis in original)). Discriminatory purpose "implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Id.* (quoting *McClesky*, 481 U.S. at 298).

Statistics alone are rarely enough to prove a discriminatory purpose. *Alston v. City of Madison*, 853 F.3d 901, 907 (7th Cir. 2017). Even when relying on statistics, "a plaintiff must always 'point to a defendant's policy or policies causing that disparity.'" *Id.* at 908

(quoting *Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 542 (2015)). In *Alston*, The Seventh Circuit explained:

> The two leading cases for this are *Gomillion v. Lightfoot*, 364 U.S. 339 (1960) and *Yick Wo v. Hopkins*, 118 U.S. 356 (1886). In *Gomillion*, the state legislature redrew the city boundary from a square to a twenty-eight-sided figure. Redistricting removed 395 of 400 black voters from city limits while no white voter was affected. *Yick Wo* involved a law that prohibited operating a laundromat in a wooden building without a permit. All but one white applicant received a permit but none of the 200 Chinese applicants did.

*Id.* "The statistics must be so stark that they are 'unexplainable on grounds other than race.'" *Id.* (quoting *Arlington Heights*, 429 U.S. at 266). Such stark data "lead[s] to the inescapable conclusion, 'tantamount for all practical purposes to a mathematical demonstration,' of discriminatory intent." *Id.* (quoting *Gomillion*, 364 U.S. at 341).

In *United States v. Davis*, the *en banc* Seventh Circuit addressed selective enforcement in an appeal involving a plan to rob a stash house that was actually a sting operation organized by law enforcement. 793 F.3d 712, 714 (7th Cir. 2015). Defendants alleged federal agents used informants and undercover agents to select individuals and present them with "the opportunity to commit a hypothetical . . . lucrative crime"— robbing a nonexistent stash house. *Id.* A federal agent posed as a disgruntled drug courier and told one of the defendants about this opportunity. *Id.* The defendant recruited several others, and they discussed the possibility of killing the stash house guards and the undercover agent. *Id.*

The seven defendants in *Davis* (all of whom were black) argued that the prosecutor, the Federal Bureau of Investigation ("FBI"), and the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") had engaged in racial discrimination in

violation of the Equal Protection Clause. *Id.* Defendants informed the district court that, in recent years, the U.S. Attorney had prosecuted 20 stash house stings with 75 black defendants and 19 white defendants. *Id.* at 714–15.

After the district court largely granted the defendants' request for information relating to the investigation and prosecution, the government appealed. *Id.* at 715. The Seventh Circuit held the district court's order allowing discovery was "vastly overbroad." *Id.* at 722. Portions of the order required the disclosure "of thousands (if not millions) of documents generated by hundreds (if not thousands) of law enforcement personnel," which would "bog down this case (and perhaps the agencies) for years." *Id.* However, the Seventh Circuit explained that "[t]he racial disproportion in stash-house prosecution remains troubling . . . and it is a legitimate reason for discovery provided that the district court does not transgress [*United States v.*] *Armstrong* [517 U.S. 456 (1996)] or an applicable privilege." *Id.* The Court cautioned district courts to proceed in a "measured" fashion and outlined steps the district court should take on remand when addressing the requested discovery. *Id.*

First, a district court should determine whether there is any plausible reason to believe that race played a role in the investigation of the pertinent defendants by reviewing the evidence offered by the defendants. *Id.* In determining whether forbidden selectivity occurred or plausibly could have occurred, the district court should proceed "to make limited inquiries, perhaps including affidavits or testimony of the case agents." *Id.* at 723. "If the initial inquiry gives the judge reason to think that suspects of another race, and otherwise similarly situated, would not have been offered the opportunity for

a stash-house robbery, it might be appropriate to require the FBI and ATF to disclose, in confidence, their criteria for stash-house stings." *Id.* It is essential "to start with limited inquiries" and "to enlarge the probe only if evidence discovered in the initial phase justifies a wider discovery program." *Id*

Consistent with the steps outlined in *Davis*, this Court must consider whether there is any reason to believe that race played a role in the investigation and referral of Defendants for prosecution. Defendants rely on charging statistics across the Central District to argue that race played a role in their investigations. Undoubtedly, the disparity regarding the race of PPP fraud defendants is stark and warrants further inquiry by this Court. That initial inquiry was only partly satisfied by the Government's response in opposition. Therefore, the Court orders the Government to submit an affidavit providing the factual basis for Amtrak's OIG's decision to pursue or initiate an investigation against the Defendants in this case. Defendants' Status Hearing Request is also granted in that the Government's affidavit must identify any individuals Amtrak's OIG investigated in the Central District as part of its loan fraud investigations who were not referred for prosecution. If any individuals are identified, the affidavit must provide the reason for not referring them.

Additionally, the Court grants Request 1 in that Defendants may assume their compilation of PPP wire fraud case information is correct as the Government has not corrected the data in the compilation. The Court further finds the ordered discovery addresses Request 3 as it relates to the Defendants in this case. The remaining requests are either moot, overbroad, vague, outside the scope of this discovery inquiry, and/or

protected by privileges. Similar to the discovery requests in *Davis*, Requests 4 and 5 for "all documentation" are vague and overbroad. There is no legal obligation to publicly disclose the policies and selection criteria used by law enforcement to determine when and how they investigate certain crimes or individuals. *Davis*, 793 F.3d at 722. Finally, Defendants' request for "all documentation" between agencies regarding the criteria used to refer over 80 defendants for prosecution is overbroad.

Accordingly, Defendants' Motions for Discovery Related to Selective Enforcement Based on Race are granted in part and denied in part. (Docs. 133, 161, 164). The Government is hereby ordered to provide documents responsive to the Court's directions within 14 days.

ENTER: May 20, 2026

s/Colleen Lawless

COLLEEN R. LAWLESS
UNITED STATES DISTRICT JUDGE